UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

FEDERAL TRADE COMMISSION,

Plaintiff,

v.

DOXO, INC., a corporation; STEVE SHIVERS, individually and as an officer of DOXO, INC.; and ROGER PARKS, individually and as an officer of DOXO, INC.,

Defendants.

C24-0569 TSZ

ORDER

THIS MATTER comes before the Court on the motions for summary judgment of the Federal Trade Commission ("FTC"), docket no. 78, Defendant Doxo, Inc., docket no. 110, and Defendant Roger Parks, docket no. 89.[1]  Having reviewed all papers filed in support of, and in opposition to, the motions, the Court enters the following order.

---

[1] Defendant Steve Shivers has not moved for summary judgment but opposes the FTC's Motion.  Tr. (Mar. 16, 2026) at 184:14–25 (docket no. 182).

ORDER - 1

**Background**

**A.      The Defendants**

Doxo is a bill-paying service provider that allows consumers to "pay any bill, using a standardized checkout, on any device, with any payment account." See Shivers Decl. at ⁋ 2 (docket no. 112).  The service was created "to provide a competitive, independent alternative to traditional approaches, provided by individual billers or individual banks." Id.  Other benefits "include bill payment without many separate logins, without sharing payment account information with multiple parties, with a much more user-friendly mobile experience, and offering additional features like overdraft protection, credit score monitoring, and identity theft protection." Id. at ⁋ 5.  Doxo's platform has "grown to enable payment to over 115,000 billers across the United States, across a wide range of biller categories, such as utilities, phone, internet, insurance, healthcare, transportation, and government." Id. at ⁋ 7.  More than 13 million users have used Doxo to make payments to tens of thousands of unique billers nationwide.  Id.

Doxo establishes partnerships with many billers for whom Doxo serves as their primary or sole online payment option.  Id. at ⁋ 8.  Doxo refers to these billers as "direct billers" or "doxoDIRECT" billers, of which there are currently 2,374.  Id.  All other billers with whom Doxo has no partnership or relationship are referred to as "network billers." See Shivers Decl. at ⁋ 16 (docket no. 149).  The FTC's lawsuit against Defendants concerns only network billers.  See FTC Mot. at 6 n.2 (docket no. 78).

From April 1, 2019, through August 31, 2024, payments to direct billers constituted roughly 22.9 % of all payments made on Doxo.  Shivers Decl. at ⁋ 22 (docket

ORDER - 2

no. 112).  During that same time period as to network billers (77.1 % of all payments made on Doxo (77.1 % of all payments made on Doxo), the share of payments remitted to network billers (1) enrolled in the Mastercard Remote Payment and Presentment Service ("RPPS")[2] totaled 52 % of all payments made on Doxo, and (2) via check totaled 25.1 % of all payments made on Doxo.  See id.

Doxo was formed in 2008 by Shivers, Parks, and non-party Mark Goris.  Id. at ₧ 1–2.  Shivers is Doxo's Chief Executive Officer, and Parks is Doxo's Vice President of Business Development.  Id. at ₧ 2; Parks Dep. at 13:17–22, Attach. 3 to Doty Decl. (docket no. 79-3).

**B.    Doxo's bill payment process flow**

The Court begins by walking through Doxo's bill payment process flow from the perspective of a consumer looking to pay a bill.  Doxo's advertisements and its webpages contained in this process flow have changed several times over the years.

**1.    Searching how to pay a bill**

First, a consumer may navigate to a search engine, such as Google or Microsoft's Bing, and enter a query to learn where and how they can pay their bill online:

/ / /

/ / /

---

[2] RPPS "operates as a centralized electronic bill payment and presentment network, effectively serving as a hub that connects financial institutions, billers, and payment processors."  True Report at ₧ 86, Attach. 403 to Doty Decl. (docket no. 92-3).  Through RPPS, "consumers can pay bills electronically using their financial institution's bill pay systems or other originators chosen by consumers."  Id.

ORDER - 3

Ex. B to Bugbee Decl., Attach. 1 to Doty Decl. (docket no. 79-1 at 12). In this example, Doxo's website appears as the first search result after using the search query "labcorp billpay." LabCorp's official website is the second search result. Doxo's advertisement headline, "LabCorp | Pay Your Bill Online," contains the biller's name but not its own name. There is no indication that the first search result is "sponsored" or otherwise an advertisement.

The ad headlines Doxo uses for different billers are not identical and neither is the location of where Doxo's website appears in search results. Doxo sometimes runs advertisements with other companies' URLs in the ad headline. See Harle Dep. at 27:20–24, Attach. 2 to Doty Decl. (docket no. 79-2); Notice at 2 (docket no. 185). According to Zachary Luse, Defendants' expert witness on search engine optimization and website design, Doxo does not manually dictate the precise order or static nature of the text in ad headlines; rather, advertisers submit up to 15 ad headlines elements, three

ORDER - 4

of which are dynamically assembled by the search engine platform.  Luse Report at ⁋ 66, Attach. 237 to Doty Decl. (docket no. 84-37).

### 2. Biller's landing page on Doxo's website

After clicking on the link to Doxo's website, the consumer would arrive on the "landing page" as shown in the example screenshots below.



Ex. B to Bugbee Decl., Attach. 1 to Doty Decl. (docket no. 79-1 at 13).[3]  Landing pages have also been referred to as "biller pages," "info pages," and "profile pages."  Harle Dep. at 10:17–11:1, Attach. 2 to Doty Decl. (docket no. 79-2).

The following image is an example of a Doxo landing page for biller "Lake Panasoffkee Water Association" as it appeared in October 2023:

---

[3] The screenshots taken from Exhibit B to Jonathan Bugbee's declaration were captured on or about December 20, 2023.  Bugbee Decl. at ⁋ 14, Attach. 1 to Doty Decl. (docket no. 79-1).  Bugbee is an FTC investigator.  Id. at ⁋ 1.  Bugbee states that he captured each webpage of the bill pay flow until he reached the page entitled "Review and Send Your Payment."  Id. at ⁋ 14.  Defendants claim these screenshots are incomplete because they cut off portions of Doxo's website, "some of which are relevant to the inquiry."  Tr. (Mar. 16, 2026) at 92:23–93:13 (docket no. 182).  Defendants point to other exhibits that they say are archived examples of a biller's landing page on Doxo's website.  The Court has also considered Defendants' proffered materials.

DOX04430862

ORDER - 6

Doxo Mot. at 10 (docket no. 110) (citing Ex. 16 to King Decl. (docket no. 113-16 at 2)).

### 3.    "**Enter Your Payment Amount**"

Next, a consumer enters the amount to pay:



Ex. B to Bugbee Decl., Attach. 1 to Doty Decl. (docket no. 79-1 at 14).

### 4.    **Entering bill details**

In the next screen, a consumer is prompted to enter more details about their outstanding bill and personal information, including their full name, email address, zip code, and billing account number.

/ / /

/ / /

/ / /

ORDER - 7



Ex. B to Bugbee Decl., Attach. 1 to Doty Decl. (docket no. 79-1 at 15).

5.    **<u>"Please wait while we validate your bill details"</u>**

After clicking next, consumers are presented with the following screen:

ORDER - 8

Ex. B to Bugbee Decl., Attach. 1 to Doty Decl. (docket no. 79-1 at 16).

### 6.    "Create Your Login"

Consumers new to Doxo are then asked to create a Doxo account by using their email address previously provided and entering a password.



Ex. B to Bugbee Decl., Attach. 1 to Doty Decl. (docket no. 79-1 at 17).

### 7.    Selecting a payment method

Consumers are then asked to select a payment method:



Ex. B to Bugbee Decl., Attach. 1 to Doty Decl. (docket no. 79-1 at 19).

ORDER - 9

**8.     "Enter Your Payment Account"**

After selecting a payment method, such as a credit card in the example screenshot below, consumers are prompted to provide details about that payment method.



Ex. B to Bugbee Decl., Attach. 1 to Doty Decl. (docket no. 79-1 at 20).

**9.     "Review and Send Your Payment"**

On the last step of Doxo's bill pay process flow, consumers are asked to review the transaction information and "Send Payment."

ORDER - 10



Ex. B to Bugbee Decl., Attach. 1 to Doty Decl. (docket no. 79-1 at 21).  After clicking

"Show payment details," the following dropdown is displayed:



ORDER - 11

Ex. B to Bugbee Decl., Attach. 1 to Doty Decl. (docket no. 79-1 at 22).

Ex. B to Bugbee Decl., Attach. 1 to Doty Decl. (docket no. 79-1 at 24).  Doxo charges

payment delivery fees to consumers who use certain payment methods.  See Ex. 15 to

King Decl. (docket no. 114-7 at 2); see also Ex. 10 to King Decl. (docket no. 113-10 at

2).  These fees vary depending on the payment method selected, Doxo's relationship with

the specific biller, and the amount of the bill.  See Ex. 11 to King Decl. (docket no. 114-

5).  Consumers who pay using a linked bank account may pay any biller in Doxo's

directory, regardless of affiliation with Doxo, without a delivery fee.  Ex. 15 to King

ORDER - 12

Decl. (docket no. 114-7 at 2).  For standard bank transfers, a fee applies and when paying by credit card, a variable fee may apply, which reflects both Doxo's service fee and the costs charged by the credit card processor.  Id.; Ex. 12 to King Decl. (docket no. 114-6).

**C.      The doxoPLUS subscription**

Separate from its bill payment services, Doxo also offers a subscription service called "doxoPLUS."  For bill payments, doxoPLUS expands the set of payment methods that are eligible for free payments to include standard bank transfers and some debit card payments.  Ex. 15 to King Decl. (docket no. 114-7 at 2).  Other subscription benefits include financial protection and monitoring benefits, including up to $1 million in identity theft protection, credit score monitoring, overdraft fee reimbursement, and late fee reimbursement.  See Ex. 13 to King Decl. (docket no. 113-13 at 12–13).  A doxoPLUS subscription costs $5.99 per month, plus tax where applicable.  See Ex. B to Bugbee Decl., Attach. 1 to Doty Decl. (docket no. 79-1 at 24).

**D.      Communications to Doxo**

**1.        Biller and consumer communications**

Out of about 100,000 billers, approximately 500 reached out to Doxo to complain. Shivers Dep. at 25:07–22, Attach. 51 to Doty Decl. (docket no. 80-1).  The basis of the complaints varies and include topics such as customer confusion, see Attachs. 182–86, 234, 267–68, 287 to Doty Decl. (docket nos. 83-32–36, 84-34 at 2, 86-17 at 3–5, 86–18 at 4–5, 86–37 at 2), and fielding calls from customers angry that they were charged late fees when they paid on time, see Attachs. 230, 267–68, 287 to Doty Decl. (docket nos. 84-30 at 5, 86-17 at 3–5, 86–18 at 4–5, 86–37 at 2).  Defendants maintain a no removal policy,

ORDER - 13

generally declining to remove billers from their directory.  See Lane Dep. 51:9–52–3, 60:09–17, 65:04–66:11, Attach. 10 to Doty Decl. (docket no. 79-10).

### 2. Government agency inquires

From May 18, 2016, through April 17, 2025, Doxo received 141 communications from state and federal government agencies.  See Attach. 312 to Doty Decl. (docket no. 87-12 at 2–10).  This includes complaints from states' attorneys' general; the Consumer Financial Protection Bureau; states' securities commissions, departments of banking, consumer affairs, and financial services, and consumer protection divisions; and the Department of Justice's Civil Enforcement Division.  See id.  According to Shivers, in some instances, these government agencies receive complaints directly from consumers or billers about Doxo and then forward them to Doxo, asking for a response.  Shivers Dep. at 17:01–16, Attach. 51 to Doty Decl. (docket no. 80-1); see Attach. 312 to Doty Decl. (docket no. 87-12 at 2–10) (100 inquiries labeled with issue type "Consumer Complaint" and 27 inquiries labeled with issue type "Biller Complaint").

### E. Substance of the FTC's claims

The FTC initiated this lawsuit in April 2024.  Compl. at pp. 1, 23 (docket no. 1).  The FTC alleges that Defendants have violated Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a), Section 521 of the Gramm-Leach-Bliley Act ("GLB Act"), 15 U.S.C. § 6821, and Section 4 of the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8403.  Id. at ¶¶ 76–81, 85–86, 91–94.  All parties, except Shivers, have moved for summary judgment on all claims.

ORDER - 14

**Discussion**

**A.      Summary judgment standard**

The Court shall grant summary judgment if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A fact is material if it might affect the outcome of the suit under the governing law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  To survive a motion for summary judgment, the adverse party must present affirmative evidence, which "is to be believed" and from which all "justifiable inferences" are to be favorably drawn.  Id. at 255, 257.  When the record, however, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, summary judgment is warranted.  See Beard v. Banks, 548 U.S. 521, 529 (2006) ("Rule 56(c) 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" (quoting Celotex, 477 U.S. at 322)).

"When parties submit cross-motions for summary judgment, '[e]ach motion must be considered on its own merits.'"  Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two, 249 F.3d 1132, 1136 (9th Cir. 2001) (quoting William W. Schwarzer, et al., *The Analysis and Decision of Summary Judgment Motions*, 139 F.R.D. 441, 499 (Feb. 1992)).  "In fulfilling its duty to review each cross-motion separately, the court must review the evidence submitted in support of each cross-motion."  Id.  Additionally,

ORDER - 15

"when simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them." Id. at 1134. If the moving party does not bear the ultimate burden of persuasion at trial, it can show the lack of such a dispute by either: (1) producing evidence negating an essential element of the nonmoving party's case, or (2) showing that the nonmoving party lacks evidence of an essential element of its claim or defense. FTC v. Amazon.com, Inc., 2025 WL 2677086, at *4 (W.D. Wash. Sept. 17, 2025) ("Amazon").

This Order addresses only the liability of Defendants on summary judgment. The Court DEFERS ruling on any injunctive relief or damages.

**B.    Preliminary issues**

The Court first addresses two preliminary issues that affect all claims.

**1.    Timing**

The FTC alleges Defendants violated federal law over a period of several years but seeks monetary damages from February 2021 through August 2024. See FTC Mot. at 38 (docket no. 78) (stating that the FTC seeks the return of delivery fees for billers with no relationship to Doxo and total doxoPLUS subscription fees); see also Miles Decl. at ₱₱ 9 & 19, Attach. 21 to Doty Decl. (docket no. 79-21) (calculating total delivery fees Doxo users paid from February 2021 through August 2024, and the estimated total doxoPLUS subscription fees paid from February 2021 through August 2024). Doxo's advertisement practices and website have changed over time. The parties have not

ORDER - 16

offered, jointly or otherwise, screenshots of ad headlines, Doxo's website, or Doxo's bill process payment flow that they say are representative during the relevant time period. The Court must first identify the evidence in the record that should be considered for the pending motions.[4]

At least two other courts have been confronted with a similar issue, which the Court will look to for guidance. In DIRECTV, the court following a bench trial noted that it was confronted with an immediate challenge when attempting to determine the net impression of the defendant's advertisements: the FTC's evidence spans at least four tiers, which together encompassed tens of thousands of discrete advertisements used by the defendant over an eight-year period. 2018 WL 3911196, at *1, 7 (N.D. Cal. Aug. 16, 2018). "All told, the FTC's theory of the case thus requires the Court to attempt to determine the 'net impression' of more than 40,000 advertisements, across print, television, and electronic formats." Id. at *7. The DIRECTV Court decided to proceed in the following fashion: (1) the court examined the single print advertisement analyzed by an expert witness to determine whether the net impression created by that advertisement would be likely to mislead consumers acting reasonably under the

---

[4] Defendants first raised this issue at oral argument, in what they call the "DirecTV Problem," based on FTC v. DIRECTV, Inc., 2018 WL 3911196 (N.D. Cal. Aug. 16, 2018). Tr. (Mar. 16, 2026) at 138:17–139:5 (docket no. 182). The FTC argues that because oral argument was the first time that Defendants raised this issue, it is waived. Resp. at 1 (docket no. 186) (citing Doe (S.A.S.) v. Hilton Domestic Operating Co. Inc., 795 F. Supp. 3d 1294, 1307 (W.D. Wash. 2025)). Although the FTC is correct that no party addressed this issue in their summary judgment briefs, the Court will need to consider a representative universe of evidence before proceeding, regardless of whether the parties had raised the issue. The courts in DIRECTV and FTC v. Johnson, 96 F. Supp. 3d 1110 (D. Nev. 2015), discussed below, appear to have proceeded in the same fashion.

ORDER - 17

circumstances; and (2) the court considered whether, even if the net impression of that advertisement was misleading, that impression can be generalized to any of the other advertisements in evidence or to the tens of thousands of other advertisements, the vast majority of which were never admitted into evidence, spanning an eight-year period across different media.  Id.

In Johnson, the court confronted a similar problem.  The Johnson Court concluded that for the purposes of summary judgment, "the Court cannot rely solely on the representations of the FTC and their expert as to what the websites represent."  96 F. Supp. 3d at 1121.  The FTC alleged that the defendants used websites to offer "free or risk-free" information about their products or programs but collected information on and charged consumers' credit card or bank account with recurring monthly fees for subscription plans.  Id. at 1116.  The Johnson Court noted that in support of the FTC's motion for summary judgment, the FTC had provided over one-hundred exhibits of websites and an expert report.  See id. at 1116, 1121.  It remained unclear to the Johnson Court whether the FTC's examples were representative of the website experience as a whole.  Id.  "The Court cannot adopt the FTC's approach of using selected examples of claims picked from across the entire universe of the FTC's exhibits, seemingly without a clear methodology, and draw conclusions as to every one of Defendants' sites."  Id. at 1121.  The Johnson Court decided, in a light most favorable to the defendants, to focus its inquiry on "those website images that Defendants provided to the FTC and those that they ask the Court to review."  Id. at 1121–22.

ORDER - 18

The Court concludes that Bugbee's screenshots of Doxo's advertisements on search engines results and Doxo's website including the bill process pay flow offers the proper representative focus.  Defendants object to Bugbee's screenshots' reliability based on incompleteness, but other than the landing page, Defendants have not directed the Court to any other evidence that would suggest the remaining screenshots are materially inaccurate or incomplete.  Additionally, the "current" screenshots that Defendants rely on were captured after this litigation began.  For the purposes of liability,[5] the net impression of Doxo's current advertisements and website is not relevant.  <u>DIRECTV</u> and <u>Johnson</u> are therefore distinguishable, because (1) Defendants' screenshot set was not captured during the relevant period of time, unlike Bugbee's; (2) the variations in ad headlines, such as the use of a biller's name and/or URL, and the existence of an "ad" or "sponsored" designation in search results, appear to be the main focus of the parties' arguments on this issue, and these variations are relatively simple to account for whether they are present or not in Bugbee's screenshot set; and (3) the advertisements and websites that Defendants' experts reviewed are not materially different from Bugbee's so as to require a different ruling on summary judgment for either the FTC or Doxo.  <u>See e.g.</u>, Schlosser Report at ¶¶ 78–105, Attach. 448 to Doty Decl. (docket no. 92-48).

/ / /

/ / /

---

[5] The changes made to Doxo's website will be important in determining the nature and extent of any injunctive relief and/or damages.

ORDER - 19

**2.    Admissibility of Doxo's internal surveys**

Defendants challenge the admissibility of Doxo's *own* internally designed and conducted surveys.

From approximately 2019 to 2022, Doxo designed and implemented about nineteen (19) internal surveys for Doxo's own customers relating to topics such as doxoPLUS subscription cancellations and doxo account cancellations.  See Sowers Dep. at 19:09–18, Attach. 416 to Doty Decl. (docket no. 92-16); Sowers Report at ₱ 8 nn. 6 & 7, Attach. 415 to Doty Decl. (docket no. 92-15); App'x H at 1–13 to Sowers Report, Attach. 415 to Doty Decl. (docket no. 92-15).  The FTC relies on these Doxo surveys, and Defendants contend that these surveys are neither admissible nor reliable.

Brian Sowers, a market research consultant and Defendants' expert on survey design whose testimony the Court previously admitted in relevant part, see Order at 13–17 (docket no. 187), reviewed these internal surveys and summarizes his opinions as follows:  (1) the Doxo surveys are fundamentally flawed in design, implementation, and interpretation, and the conclusions that the FTC attempts to draw from them are not reliable for purposes of the current litigation; (2) the Doxo surveys fail to adhere to the basic principles of proper survey design set forth in the Federal Judicial Center's Reference Guide on Survey Research; and (3) the flaws in the Doxo surveys, of which Sowers identifies ten, are cumulative in their impact and thus render the results of the survey of no value for purposes of the current litigation.  Sowers Report at ₱₱ 12–14, Attach. 415 to Doty Decl. (docket no. 92-15).  Defendants' challenge the surveys' admissibility, arguing that they are not admissible as a party admission under Federal

ORDER - 20

Rule of Evidence 801(d)(2). [6] Doxo Mot. at 25–26 n.3 (docket no. 110).  The Court disagrees.

These internal surveys are Doxo business records and will be admitted at trial. See Federal Rule of Evidence 803(6).  These surveys are also admissible under Federal Rule of Evidence 801(d)(1) and (2) as statements of a party opponent.  They provide evidence of customer confusion relevant to the issues in this case.  Defendants' request to exclude Doxo's internal surveys is DENIED.

The Court will first address the FTC's motion for summary judgment against Doxo and Doxo's motion for summary judgment before turning to the individual defendants, Shivers and Parks.

## C.    The FTC Act Claims (Counts I & II)

The FTC brings its first two claims pursuant to the FTC Act.  See Compl. at ¶¶ 74–81 (docket no. 1).  The FTC seeks injunctive and monetary relief pursuant to

---

[6] Defendants also argue that (1) "the undisputed evidence shows those surveys were not used for or considered reliable for the purposes to which the FTC puts them by anyone at Doxo"; and (2) the surveys were not conducted according to accepted principles," relying on Sowers's testimony, and they fail to satisfy foundational requirements for admission into evidence.  Doxo Mot. at 25–26  (docket no. 110).  As to the first argument, Defendants rely on Doxo employee testimony to conclude that "the surveys were never intended to function as evaluations of consumer understanding and instead were used only for longitudinal studies of directional trends in response data."  Id. at 25; see Kreyenhagen Dep. 98:06–11, Attach. 6 to Doty Decl. (docket no. 79-6) ("regardless of what the number was, what we wanted to see is the number went down over time . . . it was more important longitudinal than the spot point number."); Sweasy Dep. 153:08–15, Attach. 4 to Doty Decl. (docket no. 79-4) (a survey "was to measure users' awareness understanding over time, and to create a baseline that we could look at month over month to see how that was changing.").  Although it may be true that Doxo employees are consistent in their interpretation of the intended purpose of the internal surveys, the results of those surveys are subject to more than one reasonable interpretation, such as construing consumers' lack of awareness of Doxo's business practices as a result of confusion of affiliation or endorsement by billers.  Therefore, the surveys cannot be excluded on that basis.  The Court rejects Defendants' second argument.

ORDER - 21

Section 19 of the FTC Act, codified as 15 U.S.C. § 57b.  Id. at ¶ 1.  Neither the FTC nor Doxo is entitled to summary judgment on Count I or II.

Under Section 5 the FTC Act, deceptive acts or practices in or affecting commerce are unlawful.  15 U.S.C. § 45(a)(1).  "An act or practice is deceptive if [1], there is a representation, omission, or practice that, [2], is likely to mislead consumers acting reasonably under the circumstances, and [3], the representation, omission, or practice is material."  FTC v. Stefanchik, 559 F.3d 924, 928 (9th Cir. 2009) (quoting FTC v. Gill, 265 F.3d 944, 950 (9th Cir. 2001)) (internal quotation marks omitted).  "A misleading impression created by a solicitation is material if it 'involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product.'"  FTC v. Cyberspace.Com LLC, 453 F.3d 1196, 1201 (9th Cir. 2006) (quoting Cliffdale Associates, Inc., 103 F.T.C. 110, 165 (1984)).  "Generally speaking, information is material where it 'concerns the purpose, safety, efficacy, or cost, of the product or service.'"  Johnson, 96 F. Supp. 3d at 1121 (quoting FTC v. Direct Mktg. Concepts, Inc., 569 F. Supp. 2d 285, 299 (D. Mass. 2008)).

Deception may be found based on the "net impression" created by a representation.  Stefanchik, 559 F.3d at 928.  In assessing whether the FTC has met its burden of establishing liability under Section 5(a) of the FTC Act, the Court must first determine what "net impression" Doxo's advertisements and website create, so that it can then decide whether this net impression was likely to mislead reasonable consumers.  See DIRECTV, 2018 WL 3911196, at *6; Johnson, 96 F. Supp. 3d at 1121.  In determining what net impression an advertisement creates, the Court considers the face of the

ORDER - 22

advertisement and may also consider extrinsic evidence.  DIRECTV, 2018 WL 3911196, at *5.  Extrinsic evidence may include common usage of terms, expert opinion as to how an advertisement might reasonably be interpreted, copy tests, generally accepted principles of consumer behavior, surveys, or "any other reliable evidence of consumer interpretation."  In re Telebrands Corp., 140 F.T.C. 278, 291 (2005).

Section 5 only requires a showing that misrepresentations possess a tendency to deceive.  See Trans World Accts., Inc. v. FTC, 594 F.2d 212, 214 (9th Cir. 1979).  The FTC is not required to show that all consumers were deceived, and the existence of satisfied consumers does not constitute a defense.  Johnson, 96 F. Supp. 3d at 1119.  Proof of actual deception is unnecessary to establish a violation of Section 5, but "such proof is highly probative to show that a practice is likely to mislead consumers acting reasonably under the circumstances."  Cyberspace.Com, 453 F.3d at 1201.

The parties have expended a significant amount of effort and resources in attempting to discern the extent of any actual confusion to consumers "acting reasonably under the circumstances."  Gill, 265 F.3d at 950.  The Court has denied motions to exclude the testimony of the FTC's lay witness Molly Smith, the FTC's expert witness Patrick McAlvanah, Ph.D., and Defendants' expert witness Margaret Daley, who will testify about measuring rates of consumer confusion.  See Minute Order at 2–5 (docket no. 191).  Dr. McAlvanah and Daley analyzed a sample of consumer communications received by Doxo and offered conclusions on what consumers reported.  Id.  The Court has also admitted in part Defendants' expert witness Brian Sowers.  Order at 13–17 (docket no. 187).  Relying on the results of Doxo's several internal surveys and the work

ORDER - 23

of Smith and Dr. McAlvanah, the FTC asserts that the record is rife with evidence of actual deception as it relates to Counts I and II.  Relying on the work of Daley and Sowers, Defendants assert that any evidence of actual deception is at most de minimis, and Doxo's internal surveys are methodologically flawed and their results unreliable for the purpose the FTC relies on them.  The Court cannot resolve on summary judgment the extent, if any, of actual consumer deception, and the Court will not embroil itself in the "battle of the experts."  See Minute Order at 3 (docket no. 191).

Accordingly, the Court's analysis of the parties' summary judgment motions for Counts I and II will consist of a facial analysis of Doxo's advertisements and website as well as other extrinsic evidence, such as expert witness testimony.

### 1.    Count I

In Count I, the FTC claims that Defendants have deceived consumers by making false or misleading misrepresentations that Doxo is an official payment channel for consumers' billers.  Compl. at ₱₱ 76–78 (docket no. 1); see FTC Mot. at 27 (docket no. 78).  The FTC relies on Doxo's use of billers' names and URLs in their advertisement headlines, use of biller names or logos that feature "prominently" on biller pages, "promise[s]" of timely payment and payment tracking, and "tell[ing] consumers that they 'validate' 'bill information.'"  FTC Mot. at 27 (docket no. 78).  The FTC further relies on inquiries into Doxo's practices by Google, Microsoft, states' attorneys general, and other

ORDER - 24

third parties.[7]  Defendants rely on their use of disclosures and disclaimers throughout the bill payment process flow and expert witness testimony that consumers can readily distinguish advertisements or sponsored links from organic search results.[8]

The FTC describes the net impression of Doxo's advertisements and bill pay process flow as follows:  "Doxo was a third-party platform *authorized by the biller*" while in truth there is "'no formal connection of any sort' between Doxo and 98% of billers."  FTC Mot. at 27 (docket no. 78) (quoting Attach. 8 to Doty Decl. (docket no. 79-8 at 3)); FTC Opp. at 12 (docket no. 133).

### i.    Doxo's advertisements and the landing page

The parties have presented evidence creating a genuine issue of material fact as to the whether Doxo's advertisement practices were "likely to mislead consumers acting reasonably under the circumstances."  Gill, 265 F.3d at 950.

/ / /

/ / /

/ / /

/ / /

---

[7] Third-party inquiries to Doxo are often the result of consumers contacting these third parties directly such as governmental agencies and the Better Business Bureau, who then forward the communications to Doxo.  Those types of inquiries are the subject of Daley, Dr. McAlvanah, and Smith's work and are linked directly to the FTC's allegations of actual confusion.  The remaining third-party inquiries, such as from Microsoft and Google concerning Doxo's advertisement practices, are subject to scrutiny by several of Defendants' expert witnesses.  Genuine issues of material fact exist about this category of evidence. when viewed in a light most favorable to the non-moving party.  The Court cannot resolve the level of actual consumer deception based on these third-party communications.

[8] Defendants contend that "the FTC has also failed to show that any alleged representation about affiliation is material."  Opp. to FTC Mot. at 22 (docket no. 147).  Materiality is an issue for trial.

ORDER - 25



Ex. B to Bugbee Decl., Attach. 1 to Doty Decl. (docket no. 79-1 at 12).  The headline of the first search result in the example above contains a biller's name, LabCorp, but not Doxo's name.  This appears to be an organic search result, because there is no indication that the result is an advertisement, by using a label such as "ad" or "sponsored."  See Luse Report at ¶ 41, Attach. 237 to Doty Decl. (docket no. 84-37) ("Platforms like Google demarcate ads through standardized visual indicators such as 'Ad' or 'Sponsored' labels, distinct formatting, clear attribution of the advertising party, and, in many cases, top-of-page positioning.").  The website owner, Doxo, the website URL, and the text underneath the ad headline ("You can pay your LabCorp bill through doxo.com") all state Doxo's name, which constitutes evidence that consumers are not navigating to their biller's website if they click on the first link.

/ / /

/ / /

ORDER - 26

Ex. B to Bugbee Decl., Attach. 1 to Doty Decl. (docket no. 79-1 at 13). On this landing page, consumers are greeted by large text with the biller's name on the left and prominent banner titles that invite the consumer to "Pay your LabCorp bill with doxo" and "Pay Your Bills Securely with doxo." These statements could cause reasonable consumers to believe that they are on LabCorp's official website. In contrast, the explicit statements relied on by Doxo disclaiming official affiliation or endorsement of Doxo by the biller are less prominent.[9] Disclaimers do not dispel an otherwise misleading impression when the disclaimer is small, ambiguous, or contradicted by the body of an advertisement. See Cyberspace.Com, 453 F.3d at 1200–01. In the screenshot above, Doxo explains that it is "not an affiliate of or endorsed by LabCorp" in a smaller and lighter gray font. These

---

[9] Doxo relies on a prior case from this District to bolster its argument that its disclaimers are sufficient to defeat any claim of affiliation or endorsement. See CMRE Fin. Servs. Inc. v. Doxo Inc., 2022 WL 16701259, at *3 (W.D. Wash. Oct. 7, 2022), report and recommendation adopted, 2022 WL 16699090 (W.D. Wash. Nov. 3, 2022). CMRE is distinguishable. The CMRE Court did not include any screenshots of Doxo's websites, but quoted disclaimer language and noted the text of the disclaimers "are not in any smaller font that other text on the Biller Profile Page and are not the type of tiny disclaimers, which were set off on a different panel or at the very bottom of the web page." Id. at *8. The CMRE Court did not discuss, for example, any variance in text color of the disclaimers (lighter gray instead of black) compared to the rest of the text on the webpages or Doxo's advertisements. See id. at *5–8.

ORDER - 27

disclaimers are displayed twice:  once just below the "PAY BILL" green button, and above the heading "Useful Information for LabCorp Customers."  The example landing page Doxo offers does not contain any further disclaimers on the issue of a biller's official affiliation or endorsement of Doxo.  See Doxo Mot. at 10 (docket no. 110) (citing Ex. 16 to King Decl. (docket no. 113-16 at 2)).  The disclaimer as to official affiliation or endorsement is listed one other time in the bill process pay flow:



Ex. B to Bugbee Decl., Attach. 1 to Doty Decl. (docket no. 79-1 at 15).  Here, Doxo states in small black text close to the bottom of the screen that "doxo is not an affiliate of LabCorp . . . No endorsement has been given nor is implied."  Id.

Defendants rely on expert testimony from Ann Schlosser, Ph.D., a marketing professor whose research focuses on consumer behavior, Internet and digital marketing,

ORDER - 28

and communication in technology-mediated environments, and Luse.  Schlosser Report at ¶¶ 4 & 6, Attach. 448 to Doty Decl. (docket no. 92-48).  After conducting a "purchase decision-making process," where she carefully walks through each webpage in Doxo's bill pay process flow, Dr. Schlosser opines that reasonable consumers would correctly interpret search engine results, Doxo's website, accompanying disclosures and are not likely to be confused.  Schlosser Report at ¶¶ 15–21 & 48–55, Attach. 448 to Doty Decl. (docket no. 92-48).  After reviewing Doxo's Google and Microsoft advertisement accounts and advertisement practices, Luse opines that Doxo's advertisement accounts "are structured and managed in a manner that is typical for advertisers of comparable scale," Doxo's advertising practices "comply with platform rules," and Doxo's biller directory is "fully consistent" with user expectations.  Luse Report at ¶¶ 64–65 & 123, Attach. 237 to Doty Decl. (docket no. 84-37).

A facial reading of Doxo's advertisements and a review of Defendants' experts' testimony create a genuine issue of material fact as to whether consumers acting reasonably would likely be misled by Doxo's advertisements and website into believing that Doxo was the official payment channel for the consumers' billers.

### ii.    Doxo's payment tracking

The FTC also points to the following steps of Doxo's bill pay process on the issue of timely payments to billers:

///

///

///

ORDER - 29



Ex. B to Bugbee Decl., Attach. 1 to Doty Decl. (docket no. 79-1 at 13).



Ex. B to Bugbee Decl., Attach. 1 to Doty Decl. (docket no. 79-2 at 21).  The FTC contends that consumers often incur late fees as a result of their payments not being received or being received untimely by their billers after paying through Doxo.  See FTC Mot. at 13, 18, 28 (docket no. 78).  Defendants argue that the explicit disclosure as to

ORDER - 30

when a payment will be "delivered" by, as shown in the screenshot above, is not the same as when the biller will "credit" the payment to the consumer's account. See Opp. at 14 to FTC Mot. (docket no. 147). While what Defendants argue may be true, that distinction is not readily apparent to consumers navigating Doxo's bill payment process. A belief of official affiliation or endorsement may lead a reasonable consumer to believe that the delivery date of the bill is the same as when the consumer's account will be credited, and their debt to their biller satisfied. Doxo's use of disclaimers, however, creates a genuine issue of material fact as to the likelihood that a reasonable consumer would believe Doxo to be an official payment channel for the consumer's biller.

### iii.      **Validation of a consumer's billing information**

The FTC claims that Doxo falsely represents that they "validate" information consumers provide about their billers, such as a biller account number. The FTC is referring to the following screen of Doxo's bill payment process:



ORDER - 31

Ex. B to Bugbee Decl., Attach. 1 to Doty Decl. (docket no. 79-1 at 16).  For network billers, it is undisputed that Doxo does not "validate" a consumer's bill details by cross-checking the information provided with any database maintained by the biller, because Doxo does not have access to any of that information.  See e.g., Attach. 179 at 2, Doty Decl. (docket no. 83-29); Attach. 28 to Doty Decl. (docket no. 79-28 at 2).  A reasonable consumer, however, believing that Doxo "validates" their bill details could believe that Doxo is in some way affiliated with their biller.  Although the validation statement is some evidence that Doxo is related to the biller, Defendants have presented sufficient evidence[10] to create a genuine issue of material fact on whether the statement is "likely to mislead consumers acting reasonably under the circumstances."  Gill, 265 F.3d at 950.

Accordingly, the FTC's Motion for Summary Judgment, docket no. 78, and Doxo's cross Motion for Summary Judgment, docket no. 110, as to Count I are DENIED.

### 2.    Count II

In Count II, the FTC claims that Defendants have deceived consumers by making false or misleading misrepresentations that consumers will *only* pay the amount on their

---

[10] Defendants respond that "validate," as the term is used in the screenshot above, does not mean that Doxo is confirming the accuracy of a consumer's biller information before proceeding to the next step of the bill payment process.  Defendants' expert witness David True, a consumer payments expert, states that for all billers, Doxo "conducts a preliminary data validation process that checks consumer-entered account information against a set of structured rules."  True Report at ¶¶ 5 & 73, Attach. 403 to Doty Decl. (docket no. 92-3).  A data validation rule defines a format that user text input must match in order to pass the validation step.  Id.  "For billers accessible through Mastercard RPPS, data validation is not optional."  Id. at ¶ 75.  True distinguishes data validation from data verification as follows:  "Validation refers to the process of checking whether input data meets defined formatting and structural rules, such as correct length, character type, or checksum.  Verification, on the other hand, involves actively confirming the accuracy of that data through independent or third-party checks, such as confirming a customer's account number directly with the biller."  Id. at ¶ 77.

ORDER - 32

bill.  Compl. at ¶¶ 79–81 (docket no. 1); FTC Mot. at 29 (docket no. 79) ("Defendants later surreptitiously add 'delivery fees' in small, light gray text at the very end of the payment process.").

This claim concerns the following webpages in Doxo's bill process flow:



Ex. B to Bugbee Decl., Attach. 1 to Doty Decl. (docket no. 79-1 at 13).





ORDER - 33

Ex. B to Bugbee Decl., Attach. 1 to Doty Decl. (docket no. 79-1 at 14).



Ex. B to Bugbee Decl., Attach. 1 to Doty Decl. (docket no. 79-1 at 21).

The FTC argues that a reasonable consumer would understand "Pay Bill" to mean that the consumer would be paying *only* the amount entered in that text box. The FTC takes issue with the late disclosure of any delivery fees and notes that payment delivery fee is in a light gray font, smaller than the much more prominent "Total Charge" figure. FTC Mot. at 3–4, 29–30 (docket no. 78).

Defendants argue that disclosures on the billing page make clear to a reasonable consumer that they may incur a payment delivery fee, depending on the type of payment method used. In addition to disclaimers and disclosures, Defendants rely on expert testimony for the proposition that certain payment methods, such as credit cards, may

ORDER - 34

require the payment of additional fees, and many consumers prefer bill pay services that sometimes incur a fee. See True Report at ¶¶ 17–20, 99–100, 108–09, Attach. 403 to Doty Decl. (docket no. 92-3); Order at 3–5 (docket no. 187).

"Pay Bill" and "Amount to pay" are ambiguous phrases. The question is whether these phrases would be understood by a reasonable consumer to mean there would be no other fees or payment required. This inquiry presents questions of fact that cannot be resolved on summary judgment.

Accordingly, the FTC's Motion for Summary Judgment, docket no. 78, and Doxo's cross Motion for Summary Judgment, docket no. 110, as to Count II are DENIED.

**D.      The GLB Act Claim (Count III)**

In Count III, the FTC claims that Defendants violated the GLB Act by obtaining or attempting to obtain consumers' financial information by means of the false representations alleged in Counts I and II. FTC Mot. at 30 (docket no. 78); see Compl. at ¶¶ 82–86 (docket no. 1). The GLB Act prohibits obtaining or causing the disclosure of "customer information of a financial institution" through a false, fictitious, or fraudulent statement or representation to a customer of a financial institution. 15 U.S.C. § 6821(a)(2). The Court has concluded that genuine issues of material fact preclude summary judgment on the present record as to Counts I and II. Defendants contend, however, that the alleged misrepresentations in Counts I and II could not constitute violations of the GLB Act and the FTC's claim for damages is overbroad. Doxo Mot. at 30, 32 (docket no. 110).

ORDER - 35

The parties have a fundamental dispute as to (1) whether the alleged violations of the FTC Act fall within the scope of the GLB Act, and (2) whether the FTC was first required to invoke its administrative procedures instead of proceeding directly to an enforcement action in federal court in order to obtain monetary relief.  The FTC contends violations of the FTC Act in Count I and II would allow the FTC to obtain injunctive *and* monetary relief under the GLB Act.  See FTC Mot. at 38 (docket no. 78).  Defendants contend that injunctive relief, if any, must be proportional and rationally related to this case and that monetary relief is not available under the GLB Act.  See Doxo Mot. at 31 (docket no. 110).  In light of the Court's rulings on Counts I and II, the Court DEFERS any ruling regarding the scope and remedies available under the GLB Act.

**E.      The ROSCA Claims (Counts IV & V)**

In Counts IV and V, the FTC argues Defendants violated ROSCA.  Compl. at ₱₱ 87–94 (docket no. 1).  ROSCA prohibits the sale of goods or services on the Internet through a negative option feature without meeting certain requirements to protect consumers.  15 U.S.C. § 8403.  In an offer or agreement to sell or provide any goods or services, a "negative option feature" is "a provision under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer."  16 C.F.R. § 310.2(w). A seller may only use a negative option feature if the seller (1) "provides text that clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information;" (2) "obtains a consumer's express informed consent before charging the consumer's credit card, debit card, bank account, or other financial

ORDER - 36

account for products or services through such transaction;" and (3) "provides simple mechanisms for a consumer to stop recurring charges from being placed on the consumer's credit card, debit card, bank account, or other financial account."  15 U.S.C. § 8403(1)–(3).

The Court will proceed with its discussion of the FTC's ROSCA claims as follows:  (1) determine whether ROSCA's requirements are applicable to doxoPLUS; (2) define the "material terms of the transaction"; and (3) address the merits of Counts IV and V.

### 1.     Negative Option Feature

Defendants first argue that the FTC's ROSCA claims fail because consumers do not subscribe to doxoPLUS through a negative option feature, and so the requirements of ROSCA are inapplicable.  Opp. at 2–3 to FTC's Mot. (docket no. 147); see Doxo Mot. at 32–34 (docket no. 110).  Defendants rely on ROSCA's legislative history, the statute's stated purpose, vacated rulemaking by the FTC, and general policy arguments.  See Doxo Mot. at 32–34 (docket no. 110).  The Court previously rejected Defendants' argument and does so again.  See FTC v. Doxo, Inc., 771 F. Supp. 3d 1162, 1180 (W.D. Wash. 2025).

As the Court held in its Order on Defendants' motion to dismiss, courts have broadly applied "negative option feature" to renewal subscriptions.  Id. (citing United States v. MyLife.com, Inc., 499 F. Supp. 3d 757, 761–62 (C.D. Cal. 2020); FTC v. Health Formulas, LLC, 2015 WL 2130504, at *16 (D. Nev. May 6, 2015)).  Other courts have since concluded the same.  See FTC v. Uber Techs., Inc., --- F. Supp. 3d ----, 2026

ORDER - 37

WL 976077, at *7 (N.D. Cal. Apr. 10, 2026) ("Uber") ("Numerous courts agree, concluding that the definition of a negative option feature applies 'broadly to renewal subscriptions' that have features similar to Uber One"); Amazon, 2025 WL 2677086, at *6; United States v. Adobe, Inc., 791 F. Supp. 3d 966, 982–83 (N.D. Cal. 2025) (holding that a subscription model where consumers pay for monthly access to products and renews automatically are "recurring charges, effected through silence, [that] constitute negative option features"). Defendants have not offered, and the Court has not found, any cases that have held otherwise.

In Amazon, the court held that "[t]he plain language of ROSCA and the Federal Trade Commission's Telemarketing Sales Rule confirm that [Amazon] Prime is subject to ROSCA." 2025 WL 2677086, at *5. Defendants' arguments here largely mirror those made by the defendants in Amazon. Defendants do not respond to the Amazon Court's reasoning, but instead repeat the same tired and rejected arguments, claiming the Amazon Court was simply wrong. At oral argument, Defendants acknowledged that their position is inconsistent with the Amazon Court's holdings and request a ruling that contradicts them.[11] See Tr. (Mar. 16, 2026) at 170:02–18 (docket no. 182); see also Doxo Mot. at 39 (docket no. 110). The Court declines to so rule.

The Court concludes as a matter of law that doxoPLUS employs a negative option feature and is therefore subject to ROSCA's requirements.

---

[11] Notwithstanding the arguments of his attorneys, Shivers has stated that after Amazon was decided, "we immediately acted to align with it." See Shivers Decl. at ¶¶ 36–38 (docket no. 149).

ORDER - 38

## 2.    "**Material terms of the transaction**"

Counts IV and V depend on properly identifying the "material terms of the transaction." 15 U.S.C. § 8403(1); see 15 U.S.C. § 8403(2) (requiring "a consumer's express informed consent before charging the consumer[] . . . for products or services *through such transaction*" (emphasis added)). Neither "transaction" nor "material terms" are defined by ROSCA.

The "transaction" underlying Counts IV and V is the doxoPLUS subscription sign-up. "The ordinary meaning of 'transaction' necessarily implies some type of business dealing between parties." FTC v. Dave, Inc., 2025 WL 2698698, at *13 (C.D. Cal. Sept. 12, 2025) (quoting Turner v. Cook, 362 F.3d 1219, 1227 (9th Cir. 2004)). A term is material if it "involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product." Cyberspace.Com, 453 F.3d at 1201. "Thus, 'all material terms of the transaction' refers to those terms of real importance or great consequence bearing on the business dealing." Dave, 2025 WL 2698698, at *13.

Defendants concede the following are material terms of the doxoPLUS subscription: "the monthly price, the availability of free payment delivery[,] . . . [and] the amount the consumer will save on the current bill payment." Doxo Mot. at 35 (docket no. 110). These terms fall within the purview of Counts IV and V.

## 3.    **Count IV**

In Count IV, the FTC contends that Defendants have violated 15 U.S.C. § 8403(1) by (i) failing to disclose doxoPLUS's subscriptions terms before obtaining payment

ORDER - 39

information, and (ii) failing to provide clear and conspicuous disclosures of the material terms of the transaction.  FTC Mot. at 30–31 (docket no. 78); see Compl. at (docket no. 1).  Defendants dispute both contentions.  Doxo Mot. at 34–38 (docket no. 110).

### i.    The timing of disclosures

The evidence presented establishes that the FTC is entitled to summary judgment on Count IV.  The FTC relies on the following portions of Doxo's bill pay process:



Ex. B to Bugbee Decl., Attach. 1 to Doty Decl. (docket no. 79-1 at 20).

ORDER - 40



Ex. B to Bugbee Decl., Attach. 1 to Doty Decl. (docket no. 79-1 at 21).  These screenshots show Doxo collected a consumer's billing information *before* doxoPLUS's material terms, such as its price, are disclosed to a consumer.  See id. at 20–24.  This practice violates the plain text of ROSCA, and no reasonable jury could find in favor of Doxo when provided with this evidence.  See Amazon, 2025 WL 2677086, at *8.

ORDER - 41

Recently, another court reached a similar result.  See Uber, 2026 WL 976077, at *4.  In Uber, the district court denied the defendant's motion to dismiss the FTC's ROSCA claim pursuant to 15 U.S.C. § 8403(1) because the subscription service "Uber One" employed a negative option feature.  Id. at *4, 7.  On the same screen that displayed Uber One's terms, Uber indicated to consumers that it will charge their preexisting payment methods to pay for Uber One.  Id. at *8.  Uber argued that "[n]othing in ROSCA says that companies . . . may not give consumers the option to auto fill the billing information already on file."  Id. (quoting FTC v. Amazon.com, 735 F. Supp. 3d 1297, 1320 (W.D. Wash. 2024)).  The Uber Court rejected that argument, noting that "ROSCA requires that consumers be given that choice *after* the disclosures."  Id. (quoting Amazon.com, 735 F. Supp. 3d at 1320).  Consumers consent to Uber's use of preexisting payment methods "only in the limited sense that they decline to select the 'switch' option to input different billing information; "they are required to take an action that is a form o[f] opting out."  Id.  doxoPLUS subscription signups operate the same way.  Consumers have the option to change how they would like to pay for their doxoPLUS subscription on the same webpage that they find the subscription's material terms, but only after having provided billing information on the previous webpage.  The statute requires consumers be given a choice of what payment method to use only *after* the necessary disclosures.

The Court rejects Defendants' argument that offering consumers an option to change their billing method on the same page as the doxoPLUS subscription satisfies the timing of disclosure issue.  Accepting Defendants' argument would require a reading of

ORDER - 42

"billing information" that is far narrower than the regulations provide.  Billing information means "any data that enables any person to access a customer's or donor's account, such as a credit card, checking, savings, share or similar account, utility bill, mortgage loan account, or debit card."  16 C.F.R. § 310.2(c).  A consumer's account data, such as credit card information, need not be the same data that the customer uses to ultimately pay for a doxoPLUS subscription.  Any distinction based on the payment method data that Doxo actually retains or uses to charge a consumer is irrelevant for the purposes of 15 U.S.C. § 8403(1).

Defendants additionally claim, relying on 15 U.S.C. § 8401(8), that under the FTC's theory on the timing of disclosure, "any company offering both a standalone product or service and a subscription could face massive monetary liability simply because of the order in which information is collected and offers presented," and "[t]hat sweeping result bears no resemblance to the conduct Congress sought to prohibit through ROSCA."  Doxo Mot. at 39 (docket no. 110).  Congress found that "in exchange for 'bounties' and other payments, hundreds of reputable online retailers and websites shared their customers' billing information, including credit card and debit card numbers, with third party sellers through a process known as 'data pass,'" and these third party sellers "charged millions of consumers for membership clubs without ever obtaining consumers' billing information directly from consumers."  15 U.S.C. § 8401(4), (6).  Defendants' argument lacks merit.

Defendants attempt to engage in a statutory interpretation analysis to discern ROSCA's scope.  "[C]anons of construction are no more than rules of thumb that help

ORDER - 43

courts determine the meaning of legislation, and in interpreting a statute a court should always turn first to one, cardinal canon before all others.  We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." Connecticut Nat. Bank v. Germain, 503 U.S. 249, 253–54 (1992).  Therefore, a court's "inquiry begins with the statutory text, and ends there as well if the text is unambiguous." BedRoc Ltd., LLC v. United States, 541 U.S. 176, 183 (2004).  The Court determines "if a statute's meaning is plain or ambiguous by looking to 'the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.'" See Connell v. Lima Corp., 988 F.3d 1089, 1097 (9th Cir. 2021) (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 341 (1997)).

15 U.S.C. § 8403(1) is not ambiguous, the Court need only construe the statute's plain terms, and any further analysis of Congressional findings underlying the enactment of ROSCA is unnecessary.  Defendants offer no explanation for any specific term within 15 U.S.C. § 8403(1) that could be construed as ambiguous, and their attempt to create uncertainty fails.  Although "material terms of the transaction" is not defined by the statute, as discussed above, discerning with precision what terms may be material is irrelevant here where Doxo failed to disclose *any* terms of the doxoPLUS subscription prior to obtaining the consumer's billing information.  No language in 15 U.S.C. § 8403(1) limits the circumstances under which its terms apply.

### ii.    **Clear and conspicuous disclosure**

The FTC also argues that Doxo has violated 15 U.S.C. § 8403(1) by failing to clearly and conspicuously disclose (1) that delivery fees are waived only for certain

ORDER - 44

payment methods, and (2) the price of a doxoPLUS subscription. FTC Mot. at 31 (docket no. 78). As to the first issue, the FTC contends that Defendants' representation that "all" payments made as a doxoPLUS subscriber were fee-free was false and the "purported 'correction' was hidden behind *two* hyperlinks and is itself false." FTC Reply at 13 (docket no. 167).

"Clear" means "reasonably understandable" and "[c]onspicuous" means "readily noticeable to the consumer." Gilberg v. California Check Cashing Stores, LLC, 913 F.3d 1169, 1176 (9th Cir. 2019) (quoting Rubio v. Capital One Bank, 613 F.3d 1195, 1200 (9th Cir. 2010)). The conspicuousness of a disclosure can be evaluated on its face. See Barrer v. Chase Bank USA, N.A., 566 F.3d 883, 892 (9th Cir. 2009).

The text in the doxoPLUS subscription box states in relevant part that "doxoPLUS subscribers pay all their bills without payment delivery fees. Start today for $5.99 per month (plus tax where applicable). Cancel anytime. By selecting the box above you agree to the User Terms of Service." See Ex. B to Bugbee Decl., Attach. 1 to Doty Decl. (docket no. 79-1 at 21). The representation that doxoPLUS subscribers pay all of their bills without incurring fees is unequivocal and false. From April 1, 2019, through August 31, 2024, Doxo recorded only 85.9 % free payments made by doxoPLUS subscribers with no delivery fee. Shivers Decl. at ⁋ 22 (docket no. 112). A doxoPLUS subscription only unlocks additional payment methods as free options for consumers compared to non-subscribers, but in no circumstance is every payment method free to consumers. See Ex. 15 to King Decl. (docket no. 114-7 at 2). The cost of bill payment delivery is a

ORDER - 45

material term of the doxoPLUS subscription transaction.  See Doxo Mot. at 35 (docket no. 110).

Defendants have failed to show that the disclosure of the cost of delivery fees for doxoPLUS subscribers is clear.  Defendants argue that the doxoPLUS terms of use explain which payment methods will still require additional fees and have offered expert testimony to suggest that bill payments are never truly fee—there is always a cost.  Doxo Mot. at 36–37 (docket no. 110); True Report at ⁋⁋ 107–08, Attach. 403 to Doty Decl. (docket no. 92-3).  Viewing these facts in the light most favorable to Defendants, this evidence suggests at best that there are inconsistencies between the text consumers see during the doxoPLUS sign-up process and doxoPLUS's terms of service.  This disclosure is not clear and therefore violates 15 U.S.C. § 8403(1).

Defendants have also failed to show that the disclosure of the cost of delivery fees for doxoPLUS subscribers is conspicuous.  Defendants clearly understood that the continued existence of delivery fees for doxoPLUS subscribers who use certain payment methods is revealed only after a consumer navigates through two hyperlinks to find the doxoPLUS subscription terms.  See Attach. 463 to Doty Decl. (docket no. 134 at 36) (Slack Chat message dated January 31, 2024, from Parks to Shivers stating that consumers had to "hop[] through" the standard terms of service instead of linked to doxoPLUS's terms of service directly).  This disclosure is not conspicuous and therefore violates 15 U.S.C. § 8403(1).

Defendants have also failed to show that the disclosure of the price of a doxoPLUS subscription is conspicuous.

ORDER - 46

Ex. B to Bugbee Decl., Attach. 1 to Doty Decl. (docket no. 79-1 at 21).  In the screenshot above, the doxoPLUS text states "[s]tart today for $5.99 per month (plus tax where applicable)."  Id.  This information does not feature at the start of the paragraph and is not bolded or otherwise emphasized compared to the rest of the text describing the subscription service.  "Website users are entitled to assume that important provisions— such as those that disclose the existence of proposed contractual terms—will be prominently displayed, not buried in fine print."  Berman v. Freedom Fin. Network, LLC, 30 F.4th 849, 857 (9th Cir. 2022).  This disclosure is not conspicuous and therefore violates 15 U.S.C. § 8403(1).

ORDER - 47

The FTC's Motion for Summary Judgment, docket no. 78, is GRANTED as to Count IV on liability only, and Doxo's cross Motion for Summary Judgment, docket no. 110, is DENIED as to Count IV.

**4.    Count V**

In Count V, the FTC contends that Defendants have violated 15 U.S.C. § 8403(2) by failing to obtain consumers' express informed consent before charging the consumer's credit card, debit card, bank account, or other financial account for the doxoPLUS subscription.  FTC Mot. at 30 (docket no. 78); see Compl. at ¶¶ 93–94 (docket no. 1). The FTC argues that Defendants violated 15 U.S.C. § 8403(2) because Doxo's disclosures are not clear and conspicuous of material terms.  FTC Mot. at 30 (docket no. 78).  The Court agrees.

"In ROSCA cases, the failure to clearly and conspicuously disclose the material terms of a transaction can constitute evidence that a defendant did not obtain express informed consent before charging a consumer's cards or accounts."  Amazon, 2025 WL 2677086, at *9 (citing Health Formulas, 2015 WL 2130504, at *16).

The Court concluded above that Doxo failed to clearly and conspicuously disclose two doxoPLUS material terms (the availability of delivery fee-free bill payments when using certain payment methods and the price of a doxoPLUS subscription) of the transaction before obtaining a consumer's billing information.  Therefore, a consumer could not provide "express informed consent," 15 U.S.C. § 8403(2), before Doxo charges the consumer's payment method.  That the doxoPLUS enrollment process requires a

ORDER - 48

consumer to commit an affirmative act, clicking the subscription checkbox to opt into doxoPLUS, is irrelevant. See Resp. at 30 (docket no. 147).

Accordingly, the FTC's Motion for Summary Judgment, docket no. 78, is GRANTED as to Count V on liability only,[12] and Doxo's cross Motion for Summary Judgment, docket no. 110, is DENIED as to Count V.

**F.    Individual Defendants**

The FTC moves for summary judgment against Shivers and Parks on all counts, claiming both are liable for injunctive and monetary relief. FTC Mot. at 34–36 (docket no. 78). Both individual defendants oppose, and Parks independently moves for summary judgment. The Court limits its analysis on individual liability to the FTC's claims under ROSCA, Counts IV and V.

Individuals may be held liable for injunctive relief based on corporate entity violations of the FTC Act if (1) the corporation committed misrepresentations of a kind usually relied on by a reasonably prudent person and resulted in consumer injury, and (2) individuals participated directly in the violations or had authority to control the entities. FTC v. Grant Connect, LLC, 763 F.3d 1094, 1101 (9th Cir. 2014). "In order to hold an individual liable for restitution as a result of the misconduct of a corporation, the FTC must also show that the individual 'had knowledge that the corporation or one of its agents engaged in dishonest or fraudulent conduct, that the misrepresentations were the

---

[12] However, it is unclear whether the FTC's alleged damages for violations of Counts IV and V are duplicative.

ORDER - 49

type upon which a reasonable and prudent person would rely, and that consumer injury resulted.'" Id. (quoting FTC v. Publ'g Clearing House, Inc., 104 F.3d 1168, 1170–71 (9th Cir. 1997)). "To satisfy the knowledge requirement, the FTC must show that [a defendant] had actual knowledge of material misrepresentations, [was] recklessly indifferent to the truth or falsity of a misrepresentation, or had an awareness of a high probability of fraud along with an intentional avoidance of the truth." Id. at 1101–02 (internal quotation marks omitted). And "[t]he extent of an individual's involvement in a fraudulent scheme alone is sufficient to establish the requisite knowledge for personal restitutionary liability." FTC v. Affordable Media, 179 F.3d 1228, 1235 (9th Cir. 1999). Courts apply the same individual liability standards to GLB Act and ROSCA violations. See FTC v. RCG Advances, LLC, 695 F. Supp. 3d 368, 391 (S.D.N.Y. 2023); Amazon.com, 735 F. Supp. 3d at 1326–27.

### 1. Steve Shivers

The FTC argues that Shivers, as Doxo's CEO and largest individual shareholder, had the authority to control the practices at issue. FTC Mot. at 35 (docket no. 78). The FTC claims "uncontroverted evidence" proves that he not only participated in but was a primary architect of Doxo's misconduct. Id. Shivers contends that he "had no knowledge that Doxo was misleading consumers as the claims here allege," and "it was reasonable for him, among other indicators, to rely on the conclusion of a court that consumers would not be confused about Doxo's affiliation with billers." Opp. at 38 to FTC Mot. (docket no. 147). Shivers has filed a declaration, docket no. 145, opposing the

ORDER - 50

FTC's Motion for Summary Judgment.  The Court concludes that genuine issues of

material fact exist as to both issues, and summary judgment is inappropriate for the FTC.

The FTC's Motion for Summary Judgment, docket no. 78, against Steve Shivers is

DEFERRED as to Count III and DENIED as to all other claims.

**2.      <u>Roger Parks</u>**

The FTC argues that like Shivers, Parks had authority to control and participated

in Doxo's misconduct.  FTC Mot. at 36 (docket no. 78).  Parks contends that he is

entitled to summary judgment because he did not have the knowledge and control

required for individual liability.  Parks Mot. at 5 (docket no. 89).  Parks has also filed a

declaration, docket no. 148, in support of his motion for summary judgment.[13]  The Court

concludes that genuine issues of material fact exist as to both issues, and summary

judgment is inappropriate as to either party.

The FTC's Motion for Summary Judgment, docket no. 78, against Roger Parks is

DEFERRED as to Count III and DENIED as to all other claims, and Roger Parks's

Motion for Summary Judgment, docket no. 89, is DEFERRED as to Count III and

DENIED as to all other claims.

---

[13] The FTC appears to argue that the Court should disregard or otherwise not credit Parks's declaration as it contains "uncorroborated and self-serving denials [that] are insufficient to avoid summary judgment." FTC Reply at 15 (docket no. 167).  The Ninth Circuit has stated that "declarations oftentimes will be 'self-serving.'"  <u>S.E.C. v. Phan</u>, 500 F.3d 895, 909 (9th Cir. 2007).  "[D]eclarations are often self-serving, and this is properly so because the party submitting it would use the declaration to support his or her position."  <u>Nigro v. Sears, Roebuck & Co.</u>, 784 F.3d 495, 497–98 (9th Cir. 2015).  If a declaration contains factual information based on personal knowledge, then the declaration is properly considered as evidence on a motion for summary judgement.  <u>Leen v. Troth</u>, 2023 WL 6390148, at *1 (E.D. Cal. Sept. 29, 2023).  Self-serving conclusory statements are insufficient to establish a genuine issue of fact.  <u>Id.</u> Parks's declaration does not contain only self-serving conclusory statements.

ORDER - 51

**Conclusion**

For the foregoing reasons, the Court ORDERS:

(1)    The FTC's Motion for Summary Judgment, docket no. 78, is GRANTED in part, DENIED in part, and DEFERRED in part as follows:  the FTC's Motion is GRANTED as to the ROSCA claims, Counts IV and V, against Defendant Doxo on liability only; the FTC's Motion is DENIED as to the FTC Act claims against Defendant Doxo, Counts I and II, and the FTC Act and ROSCA claims against the individual Defendants, Shivers and Parks; and the FTC's Motion is DEFERRED as to the GLB Act claim, Count III, against all Defendants.

(2)    Defendant Doxo's cross Motion for Summary Judgment, docket no. 110, is DEFERRED in part and DENIED in part as follows:  Doxo's cross Motion is DEFERRED as to Count III; and Doxo's cross Motion is DENIED as to all remaining claims.

(3)    Defendant Roger Parks's Motion for Summary Judgment, docket no. 89, is DEFERRED in part and DENIED in part as follows:  Parks's Motion is DEFERRED as to Count III; and Parks's Motion is DENIED as to all remaining claims.

(4)    The following issues remain for trial:  Doxo's liability under Counts I and II, the scope of liability and availability of monetary damages under Count III, personal liability for Shivers and Parks on all counts, and the nature and extent of injunctive relief and damages on all counts.

ORDER - 52

(5)    The parties are ORDERED to mediate on or before June 30, 2026, and file a joint status report on or before July 7, 2026, stating the day(s) the parties mediated and whether mediation was successful.

(6)    The Clerk is directed to send a copy of this Order to all counsel of record.

IT IS SO ORDERED.

Dated this 21st day of May, 2026.

_____
Thomas S. Zilly
United States District Judge

ORDER - 53